### In re SCHRIOCK CONSTRUCTION, INC., Debtor.

#### Bankruptcy No. 93–30366.

United States Bankruptcy Court,
D. North Dakota.

March 31, 1997.

Ross Espeseth, Bismarck, ND, for Debtor.

Richard Olson, Minot, ND, for First Western Bank and Trust.

Wayne Drewes, Fargo, ND, Trustee.

Kip Kaler, Fargo, ND, for Trustee U.S. Trustee.

### ORDER

WILLIAM A. HILL, Bankruptcy Judge.

By decision entered January 8, 1997, the United States Court of Appeals for the Eighth Circuit reversed this court's decision which denied First Western Bank and Trust's (Bank) application for reimbursement of its attorney's fees and expenses pursuant to 11 U.S.C. § 506(b). The circuit court determined that the security agreement between the Bank and Debtor, Schrock Construction, Inc. (Schriock) did provide for recoupment of attorney's fees in bankruptcy proceedings, North Dakota law notwithstanding. The case was remanded for an award of a reasonable fee.

By Application filed September 2, 1994, the Bank as an over-secured creditor sought to recover from the sale of its collateral fees and expenses in the aggregate amount of $38,052.63 as detailed in the Application itself.

The law firm of Olson, Burns, Lee & Larson represented the Bank in connection with Schriock's financial difficulties for the period April 30, 1993, through August 24, 1994, at rates varying from $135 per hour for Richard P. Olson to $50 per hour for Adrienne Blocker. The total number of hours expended according to the detailed billing statement was 269.45 hours.

Section 506(b) allows to the holder of an over-secured claim any "reasonable fees," costs or charges provided for under the agreement. The trustee objected to the amount requested on the grounds that they were not reasonable in light of the facts and circumstances of the case. The overriding circumstance pointed to by the trustee is the Bank's greatly over-secured status [1] and, the outcome of the case as it pertained to the Bank resulted from this over-secured status rather than from anything its attorneys did. Citing *In re Foertsch,* 167 B.R. 555 (Bankr. D.N.D.1994), Attorney Olson argued that full reimbursement in the amount prayed for is justified given the complexity of the case, his skill, and the result achieved. The result achieved is the fact that the Bank realized full satisfaction of its debt- a result which the trustee charges was virtually assured from the beginning.

■ In *Foertsch, supra,* this court said that the "reasonableness" requirement operates as a limitation upon the amount of attorney's fees a court may award an over-secured creditor under § 506(b). In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court established that in fee-shifting cases the starting point for determining a reasonable fee is the "lodestar" method- the number of hours reasonably expended multiplied by a reasonable hourly rate. Courts are in agreement that an attorney's customary billing rate is the proper starting point, assuming it is not sharply at odds with the prevailing market rate. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Islamic Ctr. of Miss. v. Starkville Miss.,* 876 F.2d 465, 469 (5th Cir.1989).

■ The firm of Olson, Burns, Lee & Larson has an established reputation as an experienced commercial law firm with an expertise in bankruptcy. The hourly rates charged by Attorney Olson and others in his firm engaged in representing the Bank conform to the usual rates customarily charged for similar legal work in North Dakota and the court is satisfied that the hourly rates charged are reasonable.

■ Whether the 269.45 hours billed were reasonably expended is a more difficult assessment. It is assumed by the courts that attorneys, preparatory to submitting a fee application, will have already exercised billing judgment by excluding from the calculation hours not reasonably expended, including excessive, redundant, or otherwise unnecessary work. *Hensley,* at 434, 103 S.Ct. at 1939–40. The trustee argues that the bulk of the work done was redundant because of the Bank's grossly over-secured position.

This case began as a Chapter 11 reorganization with a Petition filed on April 30, 1993, by Schriock Construction, Inc., a company engaged in the heavy highway construction business including the crushing, hauling and laying of aggregate on highway projects. In carrying out this business Schriock used numerous pieces of heavy equipment-some held under equipment leases and some under purchase arrangements worth approximately 2.3 million dollars as of July 1992–a value that had eroded to 1.6 million dollars by August 1993. The Bank had a security interest in the bulk of the various items of equipment and although an equity cushion did exist, the margin was being rapidly eroded due to age, use and normal depreciation. Schriock remained in Chapter 11 until May 20, 1994, when the court, upon motion by the official creditors committee, directed its conversion to Chapter 7. The case was complex and while in Chapter 11 several plans as well as disclosure statements were proffered. The docket sheet alone is 90 pages in length and its examination reveals a case replete with

---

1. As of June 17, 1994, the amount owed to the Bank on account of its secured claim was $441,-602.26. The gross amount realized by the trust- ee in this case from the sale of the collateral securing the Bank's claim was approximately $1,080,175.

many contested issues concerning the nature, existence and location of various items of equipment including that pledged to the Bank as security.

■ As regards over-secured creditors, several courts have held that fees are reasonably expended when the work is reasonably necessary to protect the lien and, in that regard, whether there was a risk of nonpayment of the claim. *See, e.g., In re Thomas,* 186 B.R. 470 (Bankr.W.D.Mo.1995). The risk attendant to secured property in possession of a debtor depends upon a variety of factors. Risk is affected by the nature of the asset itself with real property being far more stable than a quickly depreciating asset such as construction machinery. It is also affected by the quality of the debtor-in-possession's management skills and the prospects for an effective reorganization. The need for aggressive and/or massive legal representation to protect a security interest escalates dramatically where the asset is wasting or remains in possession of a debtor lacking the skills or finances to care for and preserve it. In this case, Schriock's pre-bankruptcy performance was marred by four consecutive years of net operating losses. During progress of the Chapter 11 its financial picture did not improve, in fact it eroded. The company had to sell off some of its equipment and reduce payroll and when coupled with continuing post-petition operating losses, it is apparent that Schriock was in an extremely unstable financial position. Given this financial posture, all collateral remaining in its possession was at some risk due to possible non-maintenance, excessive use or worse. Throughout the Chapter 11 struggles, the Bank was actively engaged in determining the location of and use of its collateral, sorting out competing claims to various items of equipment and assessing the Debtor's prospects for reorganization- a reorganization highly dependent upon continued use of its collateral. This case was one of great complexity despite its eventual lapse into Chapter 7 and preservation of the Bank's lien was by no means a foregone conclusion had Schriock continued on with its Chapter 11 struggles.

The court has reviewed the entire file anew against the firm's fee application and cannot discern anything which stands out as obviously unnecessary or clearly excessive in preserving the Bank's lien or collateral position. Had the Bank's collateral been a stable, non-wasting, non-moveable asset the result might be different. But, here the equipment was always at risk due to its very nature and the Debtor's circumstances. In sum, the court is satisfied that the 269.45 hours detailed in the billing statement were reasonably expended in an effort to preserve the Bank's interest.

Accordingly, the application for fees filed September 2, 1994, is allowed as prayed for in the sum of $38,052.63.

**SO ORDERED.**