**In re NUMED HOME HEALTH CARE, INC., Debtor.**

No. 8:00–BK–16984–PMG.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 30, 2004.

David S. Jennis, Jennis & Bowen, Richard J. McIntyre, Tampa, FL, for Debtor.

ORDER ON (1) MOTION OF HELLER HEALTHCARE FINANCE, INC. FOR DISGORGEMENT AND FOR DISTRIBUTION TO HELLER FROM ESCROW; (2) MOTION OF HELLER HEALTHCARE FINANCE, INC. FOR THE ALLOWANCE OF REASONABLE FEES, COSTS, AND CHARGES PURSUANT TO SECTION 506(b) OF THE BANKRUPTCY CODE; AND (3) MOTION BY UNITED STATES OF AMERICA FOR DETERMINATION OF SECURED STATUS PURSUANT TO 11 U.S.C. § 506(b)

PAUL M. GLENN, Chief Judge.

THIS CASE came before the Court for hearing to consider the (1) Motion of Heller Healthcare Finance, Inc. for Disgorgement and for Distribution to Heller from Escrow; (2) Motion of Heller Healthcare Finance, Inc. for the Allowance of Reasonable Fees, Costs, and Charges pursuant to Section 506(b) of the Bankruptcy Code; and (3) Motion by United States of America for Determination of Secured Status pursuant to 11 U.S.C. § 506(b).

The basic issue raised by all of the Motions concerns the final distribution of the remaining "Allocated Plan Funds" in this case. The Allocated Plan Funds have been held in escrow, and the amount of the escrowed funds presently exceeds $195,000.00.

## Background

### A. The general case

On November 1, 2000, NuMed Home Health Care, Inc. and eight affiliates (the Debtors) filed petitions for relief under chapter 11 of the Bankruptcy Code. The affiliates included Countryside Health Services, Inc. (Countryside) and NuMed Rehabilitation, Inc. (NuMed Rehabilitation). On November 3, 2000, the Court entered an Order authorizing the joint administration of the affiliated cases. (Doc. 18).

On August 9, 2001, the Debtors filed a Final Version of Third Amended Plan of Reorganization. (Doc. 202). Generally, the Third Amended Plan provided for the "issuance of New Stock in Reorganized NuMed" to an entity known as Post Modern Medical Systems, Inc. (PMMS), in exchange for the transfer by PMMS of funds to the "Plan Fund." (Doc. 202, p. 31). The "Plan Funds" are defined as "the funds deposited into the Plan Account by or at the direction of PMMS to fund the payments to be made under this Plan." (Doc. 202, p. 9).

On August 16, 2001, the Court entered an Order Confirming Debtors' Third Amended Joint Plan of Reorganization. (Doc. 204).

On October 25, 2001, the Court entered an Order Granting "Motion for Entry of Stipulated Order Providing for Escrow of Remaining Allocated Plan Funds and Request for Emergency Telephonic Hearing" and Providing for Escrow of Remaining Allocated Plan Funds. (Doc. 230). The term "Allocated Plan Funds" is defined as "the portion of the Plan Funds, after the payment to be made to the HealthCare Financing Administration ('HCFA') at the Closing allocated to each of the Debtors based on a current valuation of the respective Debtors' assets as of the Confirmation Date." (Doc. 230, p. 2). The Order provides:

The priority of certain claims asserted by Heller and the United States against the Debtors is the subject of an adversary proceeding currently pending before the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (Adversary Proceeding No. 01–00059–8G1), . . .

To preserve and administer certain funds of the Debtors which are subject to liens and/or claims of liens in favor of the Creditors, and pursuant to the terms of the Plan, the Creditors desire to provide for the escrow of such funds, pending the outcome of the Adversary Proceeding.

(Doc. 230, p. 3). The Court therefore authorized the Escrow Agent to receive and maintain the Remaining Allocated Plan Funds in accordance with the terms set forth in the Order. The Remaining Allocated Plan Funds included the amount of $102,674.00 allocated to Countryside, and the amount of $202,762.00 allocated to NuMed Rehabilitation. (Doc. 230, p. 4).

On November 16, 2001, the Court entered a Stipulated Order Providing for Interim Distribution of Remaining Allocated Plan Funds. (Doc. 237). The Order provided for disbursements to Heller Healthcare Finance, Inc. (Heller), the United States of America (USA), and PMMS of certain Allocated Plan Funds associated with Debtors other than Countryside and NuMed Rehabilitation. The Order further provided:

All amounts distributed to Heller, PMMS, and the USA pursuant to this Stipulated Order are subject to disgorgement consistent with the final and non-appealable determinations of a court of competent jurisdiction in resolution of the IRS Adversary Proceeding, or an approved compromise thereof.

(Doc. 237, p. 4).

On October 8, 2002, the Court entered an Order Granting Post Modern's Motion for Distribution of Portion of Remaining Allocated Plan Funds. (Doc. 414). The Order was entered pursuant to a request by PMMS for a distribution in the amount of $113,291.00 on account of additional Debtor–in–Possession Financing previously authorized by the Court. The Order provides in part:

2. The Escrow Agent is hereby authorized and directed to release the amount of $113,291.00 from the Remaining Allocated Plan Funds (described in the Escrow Order as the "Escrowed Property") through wire transfer, to PostModern Medical Systems, Inc. . . . Subject to the disgorgement provisions of paragraph 3 of this Order, receipt by PMMS of this distribution shall constitute full satisfaction of the claim of PMMS in these jointly administered cases.

3. Consistent with paragraph 2 of this Court's Prior Interim Distribution Order, if, by this or prior Order of this Court, if a party has received an amount in excess of its entitlement (an "Excess Distribution") as determined by a final and non-appealable determination of a court of competent jurisdiction in resolution of the IRS Adversary Proceeding or an approved compromise thereof ("Final Determination"), the party having received the Excess Distribution ("Disgorging Party") shall disgorge immediately such Excess Distribution, without and notwithstanding any right of setoff for any other claims the Disgorging Party may assert against any other party. The Court specifically reserves jurisdiction to order and enforce such disgorgement of any Excess Distribution.

(Doc. 414, pp. 2–3). Heller had filed a Limited Opposition to PostModern's Motion for Entry of the Order. (Doc. 409).

On March 6, 2003, the Court entered an Order denying the USA's Motion to Alter or Amend Order Granting Post Modern's Motion for Distribution of Portion of Remaining Allocated Plan Funds. (Doc. 424).

**B. The Adversary Proceeding**

On February 1, 2001, the USA commenced Adversary Proceeding No. 01–59 by filing a Complaint to Determine Validity, Priority, or Extent of Liens against Heller. (Doc. 1).

On June 29, 2001, the USA and Heller filed a Stipulation in the adversary proceeding. In the Stipulation, the parties agreed in part:

1. Heller holds perfected security interests under the Uniform Commercial Code in the collateral identified in the loan documents executed by NUMED Home HealthCare, Inc., et al. This stipulation does not include any agreement as to the priority of any such perfected security interest vis-à-vis the Internal Revenue Service.

.    .    .    .    .

3. As of the petition date, the principal indebtedness due Heller under the Promissory Note was $870,963.93, plus applicable interest and fees allowed pursuant to the loan documents.

(Doc. 33).

On March 6, 2003, the Court entered its Findings of Fact, Conclusions of Law, and Memorandum Opinion in the Adversary Proceeding. (Doc. 90). In its Opinion, the Court made the following conclusions with respect to Plan Funds allocated to Countryside and NuMed Rehabilitation:

1. As to Count I of the Amended Complaint, to determine the validity, priority, or extent of liens:

A. Heller Healthcare Finance, Inc. holds a first priority security interest in the accounts receivable of Countryside Health Services, Inc. for the period prior to October 25, 2000, and the United States of America holds a first priority tax lien on the accounts receivable of Countryside Health Services, Inc. for the period between October 25, 2000, and November 1, 2000, to the extent of $7,853.88.

.    .    .    .    .

D. The United States of America has a first priority tax lien on the accounts receivable of NuMed Rehabilitation, Inc. with respect to its notice of federal tax lien that was filed on January 25, 2000. The amount of the lien was $18,425.27 as of November 1, 2000.

2. As to Count III of the Amended Complaint, for tortious conversion, a judgment should be entered in favor of the United States of America, and against Heller Healthcare Finance, Inc. for $18,166.00 with respect to the accounts of Whole Person Home Health Care of Florida, Inc., plus the unsatisfied amounts of the liens of the United States of America relating to Silver Moves, Inc. after applying credit for the $50,842.00 that the United States of America has received from the amounts allocated to Silver Moves, Inc.

(Doc. 90, pp. 32–33). A Final Judgment was entered consistent with the Memorandum Opinion. (Doc. 91).

**Discussion**

**A. Heller's Motion for Disgorgement and Distribution**

Heller filed a Motion for Disgorgement and for Distribution to Heller from Escrow. (Doc. 440). In the Motion, Heller requests that the Court enter an Order directing the USA to disgorge the amount of $38,401.76 to the Escrow Account, and further requests the distribution of

$234,259.89 to Heller in satisfaction of its secured claim. (Doc. 440, p. 6).

### 1. Disgorgement

Heller's request that the USA be required to disgorge the amount of $38,401.76 is based upon a two-step calculation:

1. First, Heller asserts that the USA has received an "overdistribution" from the Escrow Account in the amount of $87,001.75. (Doc. 440, p. 5). According to Heller, the amount of this "overdistribution" represents the difference between the amount paid to PMMS ($113,291.00) pursuant to the Order dated October 8, 2002, and the aggregate amount of the USA's first priority tax liens ($7,853.88 plus $18,425.00), as determined by the Court in the Adversary Proceeding. (Doc. 440, p. 5). Heller contends that this "excess" amount paid to PMMS should be paid to Heller by the USA because the USA requested that the funds be paid to PMMS, and because the Court determined that Heller is entitled to the funds by virtue of its decision in the Adversary Proceeding. (Doc. 440, p. 3).

2. Heller asserts that the USA should not be required to disgorge the total amount of its "overdistribution" ($87,-001.75), however, because the Court also concluded in the Adversary Proceeding that the USA is entitled to a Final Judgment in its favor against Heller in the combined amount of $48,599.99. This Judgment consists of two separate awards for tortious conversion in the amount of $18,166.00 and $30,433.99, respectively, of the accounts of two of the affiliated Debtors. Consequently, Heller contends that the USA's Judgment against Heller should be "netted out" against the amount of the USA's "overdistribution," so that the USA should only be directed to disgorge the amount of $38,401.76. ($87,001.75 minus $48,599.99 = $38,401.76). (Doc. 440, p. 5).

■ The Court finds that Heller's Motion should be denied to the extent that it seeks an order directing the USA to disgorge any portion of the funds released by the Escrow Agent pursuant to the Order dated October 8, 2002.

First, pursuant to the October 8 Order, the amount of $113,291.00 was paid to PMMS, not to the USA. Heller asserts that the payment to PMMS is tantamount to a payment to IRS because PMMS's security interest was superior to the lien of the USA but inferior to the lien of Heller. Heller further asserts that the Order provided that the USA would be responsible for the disgorgement in the event of an "Excess Distribution," even though the payment was to PMMS and not to the USA. (Transcript, p. 48).

The Court has reviewed the Order Granting Post Modern's Motion for Distribution of Portion of Remaining Allocated Plan Funds. (Doc. 414). The Order specifically authorizes the release of $113,291.00 to PMMS. (¶ 2). The Order further states that the distribution "shall constitute full satisfaction of the claim of PMMS." (¶ 2). Finally, the Order provides that "if a party has received an amount in excess of its entitlement (an 'Excess Distribution'), ... the party having received such Excess Distribution ('Disgorging Party') shall disgorge immediately such Excess Distribution." (¶ 3)(Emphasis supplied).

The October 8, 2002 Order, defines a "disgorging party" as a party that actually received the distribution. Contrary to Heller's assertion, the Order does not contain any provision that obligates the USA to return funds that were paid to another party. By its terms, the Order limits the disgorgement obligation to "the party having received such Excess Distribution." The Court will not give this provision an

unnatural construction by extending the disgorgement obligation to a party who may have received only a secondary benefit from the distribution.

### 2. "Setoff"

█ As a collateral issue, Heller had proposed to "set off" certain amounts that it owes to the USA, from the amount of the proposed disgorgement by the USA to the Escrow Account. The "setoff" relates to the Final Judgment that was entered in favor of the USA and against Heller in the Adversary Proceeding. Essentially, Heller asserts that the amount of the proposed disgorgement from the USA may be reduced by the amount that Heller owed to the USA pursuant to the Final Judgment.

█ Given the Court's determination that the USA is not required to return any of the distributed funds to the Escrow Account, the proposed setoff as framed by Heller is moot. Even if the issue were not moot, however, Heller did not establish that it was entitled to set off its judgment debt against the amount allegedly due from the USA. Heller did not show, for example, that mutuality existed between the parties, or that debts were owed between Heller and the USA acting in the same capacity. *In re Bare,* 284 B.R. 870, 872 (Bankr.N.D.Ill.2002); *In re Koch,* 224 B.R. 572, 576 (Bankr.E.D.Va.1998). Such mutuality, of course, is a required element for any claim of setoff.

Heller is indebted to the USA for tortious conversion, as evidenced by the Final Judgment entered in the Adversary Proceeding on March 6, 2003. (Doc. 91). The indebtedness stands alone as a final, enforceable obligation, and is not subject to setoff against any amounts in the Escrow Account.

### 3. Distribution to Heller

In addition to its request for disgorgement, Heller also seeks the entry of an order authorizing the distribution to it of the amount of $234,259.89 from the Escrow Account. (Doc. 440, p. 6). This total amount apparently represents the unpaid principal balance of its secured claim ($92,137.81), plus an award of attorney's fees and costs as requested in a separate Motion for Allowance of Reasonable Fees and Costs. (Doc. 441).

For purposes of the Motion for Disgorgement and Distribution, it appears undisputed that Heller is entitled to payment of the unpaid principal balance of its secured claim, or $92,137.81, from the Escrowed Funds. Heller's request for fees and costs is addressed in Section "C" of this Order.

### B. The USA's Motion for Determination of Secured Status

The USA filed a Motion for Determination of Secured Status Pursuant to 11 U.S.C. § 506(b). (Doc. 443). The Motion relates primarily to the first priority tax claims held by the USA with respect to the assets of Countryside and NuMed Rehabilitation. According to the USA, the issue raised in its Motion is "whether the United States is entitled to payment of interest and statutory fees upon its first priority secured tax claims against Countryside and NuMed Rehabilitation." (Doc. 443, p. 8).

The USA contends that the value of the assets of Countryside and NuMed Rehabilitation is greater than the amount of its claims, so that it is entitled to interest and statutory fees pursuant to § 506(b) of the Bankruptcy Code. (Doc. 443, pp. 8–9).

Section 506(b) provides:

**11 U.S.C. § 506. Determination of secured status**

.    .    .    .    .

█ (b) To the extent that an allowed secured claim is secured by property the

value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). This section "permits an oversecured creditor to receive postpetition interest from the debtor to the extent the creditor's security exceeds the value of the debtor's obligation." *In re Southeast Banking Corporation*, 156 F.3d 1114, 1119 n. 7 (11th Cir.1998)(citing *In re Delta Resources, Inc.*, 54 F.3d 722, 729 (11th Cir.1995)).

The Court determines that the USA is entitled to interest on its first priority tax claim in the case of NuMed Rehabilitation, but that it is not entitled to interest on its first priority tax claim in the case of Countryside.

### 1. NuMed Rehabilitation

■ As to NuMed Rehabilitation, the Court made the following determination in its Findings of Fact, Conclusions of Law, and Memorandum Opinion in the Adversary Proceeding:

> The Court concludes, therefore, that the USA has a first priority tax lien on the accounts receivable of NuMed Rehabilitation with respect to its notice of tax lien that was filed on January 25, 2000. The amount of the lien was $18,425.27 as of the date that the debtor's bankruptcy petition was filed. Accordingly, of the escrow amount allocated to NuMed Rehabilitation ($202,762), the sum of $18,425.27 is subject to the prior lien of the USA, and the balance is subject to the lien of Heller.

(Doc. 90, p. 24). The amount of the escrowed funds allocated to NuMed Rehabilitation ($202,762.00) was based on the value of NuMed Rehabilitation's assets as of the date that the Debtors' Third Amended Joint Plan of Reorganization was confirmed. (Doc. 227, Motion for Entry of Stipulated Order Providing for Escrow of Remaining Allocated Plan Funds, p. 2, n. 1).

Pursuant to § 6321 of the Internal Revenue Code, the USA is granted a tax lien on all of the property owned by the taxpayer.

### § 6321. Lien for taxes

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321. The lien applies to all of the taxpayer's property until either the taxpayer pays the claim or the statute of limitations lapses. 26 U.S.C. § 6322; *In re Eschenbach*, 267 B.R. 921, 923 (Bankr.N.D.Texas 2001).

Given the amount of the first priority tax lien ($18,425.27), and the value of NuMed Rehabilitation's assets ($202,-762.00), the Court concludes that the value of the property securing the USA's tax lien is greater than the amount of the claim. Accordingly, the USA is entitled to the allowance of interest on its claim pursuant to § 506(b) of the Bankruptcy Code.

### 2. Countryside

■ As to Countryside, however, the Court made the following determination in the Findings of Fact, Conclusions of Law, and Memorandum Opinion in the Adversary Proceeding:

> The USA's notice of federal tax lien was filed on October 10, 2000. Heller admits that it received knowledge of the

tax lien on October 25, 2000. Accordingly, Heller concedes that its security interest is entitled to priority only for receivables generated prior to October 25, 2000, and that the USA's tax lien is entitled to priority for receivables generated between October 25, 2000, and November 1, 2000 (the date that the petitions were filed).

*The receivables generated by Countryside between October 25 and November 1, 2000, totaled $7,853.88.*

Accordingly, Heller holds a first priority security interest in the accounts receivable generated by Countryside prior to October 25, 2000. The USA holds a first priority security interest in *the accounts receivable that were generated by Countryside between October 25, 2000, and November 1, 2000, a total of $7,853.88.* Of the funds allocated to Countryside, therefore, the lien of the USA has priority to the extent of $7,853.88, and the lien of Heller has priority for the balance of the amount placed in escrow.

(Doc. 90, p. 19)(Emphasis supplied).

The Notice of Federal Tax Lien filed by the USA on October 10, 2000, was in the amount of $90,912.01. (Doc. 90, p. 4).

The value of the property securing the USA's tax lien, however, was fixed at $7,853.88 as a result of the specific time period during which the lien was granted a priority.

The USA's lien was granted a priority position only for the specific period between October 25, 2000, and November 1, 2000. The lien applies only to the accounts receivable generated by the Debtor during that specific period. The amount of the receivables generated during the designated period is a fixed, quantified sum ($7,853.88). Only those receivables constitute the security for the USA's claim.

Consequently, the value of the property securing the USA's tax claim ($7,853.88) is not greater than the amount of the claim (in excess of $90,912.01). Pursuant to § 506(b) of the Bankruptcy Code, therefore, the USA is not entitled to interest on its first priority claim in the case of Countryside.

## C. Heller's Motion for Allowance of Fees and Costs

Heller filed a Motion for Allowance of Reasonable Fees, Costs, and Charges Pursuant to Section 506(b) of the Bankruptcy Code. (Doc. 441). In the Motion, Heller seeks an award of fees in the amount of $207,466.00, and an award of costs in the amount of $20,885.48, for a total award of $228,351.48.

Heller asserts that it is entitled to an award of the fees and costs because (1) Heller is an oversecured creditor, (2) the agreement that created the claim provides for such fees and costs, and (3) the fees and costs are reasonable. (Doc. 441, p. 3).

In response, the USA asserts that Heller is not entitled to an award of fees and costs, in part because Heller's claim is not an oversecured claim. Specifically, the USA contends that Heller's claim was approximately $905,000.00 at the time that the petitions were filed, and that none of the individual affiliated debtors had assets on that date with a value that exceeded the amount of the claim. The USA also asserts that certain of the fees and costs claimed by Heller are not reasonable.

### 1. "Agreement under which such claim arose"

The USA does not appear to dispute Heller's assertion that the agreement under which its claim arose provided for the payment of fees and costs.

## 2. Oversecured

■ As set forth above, § 506(b) "permits an oversecured creditor to receive post-petition interest [and fees and costs] from the debtor to the extent the creditor's security exceeds the value of the debtor's obligation." *In re Southeast Banking Corporation*, 156 F.3d at 1119 n. 7 (citing *In re Delta Resources, Inc.*, 54 F.3d at 729).

In this case, the parties stipulated that "[a]s of the petition date, the principal indebtedness due Heller under the Promissory Note was $870,963.93, plus applicable interest and fees allowed pursuant to the loan documents." (Adv.Pro. 01–59, Doc. 33, ¶ 3). The total amount of the debt was not allocated among the various affiliated debtors.

In any event, the parties further stipulated that "[t]he Valuation Report of Marshall & Stevens filed in this proceeding is accepted by the parties as establishing the valuation of assets as of the date or dates indicated in such report". (Adv.Pro. 01–59, Doc. 33, ¶ 2).

The effective date of the conclusions reached in the Marshall & Stevens Valuation Report was December 31, 2000, which was approximately two months after the petitions were filed. (Doc. 77, Cover letter dated January 4, 2001). In the Report, Marshall & Stevens made the following determination regarding the liquidation value of the debtors' accounts receivable as of the effective date of the Report:

> Based upon the analysis as presented, we are of the opinion that the value of the accounts receivable can be reasonably represented in the range of $1,310,000 to $1,640,000.

(Doc. 77, p. 5). The accounts receivable of all of the affiliated debtors constitute collateral for Heller's claim, in accordance with Heller's underlying loan documents. (Doc. 451, p. 4).

Based on these Stipulations and conclusions, the Court determines that Heller was an oversecured creditor on the date that the petitions were filed. As of the petition date, the principal indebtedness owed to Heller was $870,963.93, and the total debt, according to the USA, was approximately $905,000.00. The receivables that secured the debt were valued at between $1,300,000.00 and $1,640,000.00. Consequently, Heller was an oversecured creditor, and is entitled to the allowance of its reasonable attorney's fees and costs to the extent of its oversecured status.

## 3. Reasonableness

■ Heller seeks an award of attorney's fees in the total amount of $207,466.00. The fees were incurred by the law firm of Shulman, Rogers, Gandal, Pordy & Ecker, P.A. ($189,157.50) and by the law firm of Hill, Ward & Henderson, P.A. ($18,308.50). According to the Motion, the fees represent an aggregate of 852.6 hours of services performed over a period that commenced on October 13, 2000, and ended on November 5, 2002.

Heller contends that most of the fees were incurred in connection with the Adversary Proceeding commenced by the USA. (Doc. 441, p. 10).

As set forth above, Heller also seeks reimbursement of costs in the amount of $20,885.48.

■ "In making a fee determination, the Court must consider not only the fee agreement but the overall fairness and reasonableness of the fee under all of the circumstances. Reasonable fees are those necessary to the collection and protection of a creditor's claim and include fees for those actions which a similarly situated creditor might have taken. The fees must be cost justified by the economics of the

situation and necessary to preserve the creditor's interest in light of the legal issues involved." *In re Digital Products Corporation,* 215 B.R. 478, 482 (Bankr. S.D.Fla.1997).

This case involved sophisticated commercial transactions with eight inter-related debtors, the inherent risks associated with the use of cash collateral, and the prioritization of significant competing liens. Additionally, Heller was named as a defendant in an adversary proceeding that included four separate counts. The Counts included an action to determine the validity, extent, and priority of liens, an action for tortious conversion, and an action for equitable subordination. Finally, the Court acknowledges that the parties engaged in extensive discovery regarding complex accounting issues.

Clearly, the circumstances of this case justify the investment of significant time and resources on the part of Heller, and Heller has provided documentation to support its services. (Doc. 441, Motion for Allowance of Reasonable Fees, Costs, and Charges, Exhibits 7 and 8).

The Court has reviewed the Motion, the supporting documentation, and the entire record in this case, and finds that Heller is entitled to an award of its attorney's fees, and that Heller is also entitled to the reimbursement of its expenses, in the amounts claimed. The fees and costs awarded in this Order, however, should only be paid from the "Escrow of Remaining Allocated Plan Funds" to the extent of the funds remaining in such Escrow Account after payment of the USA's claims and other distributions set forth in this Order.

## Conclusion

Three Motions are currently under consideration by the Court:

First, Heller's Motion for Disgorgement and Distribution is denied to the extent that it seeks any disgorgement of funds by the USA to the estate, and the USA is not required to disgorge any funds to the escrow account. Heller is entitled, however, to distribution from the Escrow Account of the unpaid principal balance of its secured claim, in the approximate amount of $92,137.81.

Second, the USA's Motion for Determination of Secured Status Pursuant to 11 U.S.C. § 506(b) should be granted in part and denied in part. Specifically, the USA is entitled to interest on its first priority tax claim ($18,425.27) in the case NuMed Rehabilitation. The USA is not entitled, however, to interest on its first priority tax claim ($7,853.88) in the case of Countryside.

Finally, Heller's Motion for the Allowance of Reasonable Fees, Costs, and Charges Pursuant to Section 506(b) of the Bankruptcy Code is granted in part and denied in part, and Heller is entitled to attorney's fees and to the reimbursement of costs, as claimed. Such fees and costs may be paid, however, only from the "Escrow of Remaining Allocated Plan Funds" to the extent of the funds remaining in such Escrow Account after payment of the USA's claims and other distributions set forth in this Order.

Consequently, the remaining escrowed "Allocated Plan Funds," in the total approximate amount of $195,000.00, should be distributed as follows:

$ 92,137.81—to Heller (unpaid principal balance of its claim)

$ 18,425.27, plus interest—to the USA (first priority claim in NuMed Rehabilitation)

$ 7,853.88, without interest—to the USA (first priority claim in Countryside)

balance, approximately $ 76,583.04—to Heller (attorney's fees and costs)

Accordingly:

**IT IS ORDERED** that:

1.  The Motion of Heller Healthcare Finance, Inc. for Disgorgement and for Distribution to Heller from Escrow is denied to the extent that it seeks any disgorgement of funds by the United States of America.  The Motion is granted, however, to the extent that it seeks the distribution to Heller of the unpaid principal balance of its secured claim in the approximate amount of $92,137.81.

2.  The Motion by the United States of America for Determination of Secured Status Pursuant to 11 U.S.C. § 506(b) is granted in part and denied in part.  The United States of America is entitled to interest on its first priority tax claim ($18,-425.27) in the case of NuMed Rehabilitation, Inc. The United States of America is not entitled, however, to interest on its first priority tax claim ($7,853.88) in the case of Countryside Health Services, Inc.

3.  The Motion of Heller Healthcare Finance, Inc. for the Allowance of Reasonable Fees, Costs, and Charges Pursuant to Section 506(b) of the Bankruptcy Code is granted in part and denied in part, and Heller may receive its as attorney's fees and costs, in the amounts claimed.  Such award shall be paid, however, only from the "Escrow of Remaining Allocated Plan Funds" to the extent of the funds remaining in the Escrow Account after payment of the United States of America's first priority claims in the cases of NuMed Rehabilitation, Inc. and Countryside Health Services, Inc.