**In re REORGANIZED LAKE DIAMOND ASSOCIATES, LLC Debtor.**

**No. 04–05511–3F1.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

March 16, 2007.

James H. Post, Esq., Jacksonville, for
Silver Capital of Central Florida, LLC.

Jacob A. Brown, Esq., Jacksonville, for Debtor.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This case is before the Court upon (i) the Motion for Entry of Final Decree ("Final Decree Motion") filed by Reorganized Lake Diamond Associates, LLC ("Debtor"), the Objection to the Motion for Entry of Final Decree ("Final Decree Objection") filed by Silver Capital of Central Florida, LLC ("Silver"), and Debtor's Response to Objection of Silver to Motion for Entry of Final Decree ("Final Decree Response") and (ii) Silver's Motion for Payment of Bank Fee Claim ("Fee Motion") and Debtor's Objection to Motion for Payment of Bank Fee Claim ("Fee Objection"). The Court held an evidentiary hearing on the Fee Motion and Final Decree Motion on November 9, 2006. Upon the evidence presented and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

In May 2002, Community National Bank ("CNB") provided Debtor with financing for the acquisition of the Lake Diamond Golf and Country Club, a 550–acre planned residential community with golf course and a 43–acre man-made lake (the "Property"), along with construction of new model homes. Four promissory notes in the aggregate principal amount of $6,111,822.44 (the "Bank Claim") (Debtor's Ex. 1; Silver's Ex. 4) and a first mortgage lien on the Property, the Mortgage and Security Agreement dated May 20, 2002 (the "Mortgage"), evidenced CNB's secured loan. The Bank Claim was secured by, *inter alia*, the Property and certain of Debtor's other personal property.

Debtor defaulted under the terms of the loan agreements by failing to make the required monthly payments of interest for the period of October 2003 through January 2004. On February 3, 2004, following Debtor's failure to cure the default, CNB accelerated all sums due and owing and demanded payment in full. On February 24, 2004 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

Prior to the Petition Date, and for the first 11 months of the Chapter 11 Case, CNB was the holder of Debtor's secured debt. CNB, acting as the secured creditor throughout the case, did not seek any adequate protection payments with respect to the Bank Claim. On March 8, 2004, Debtor commenced an adversary proceeding against CNB, *Lake Diamond Associates, LLC v. Community National Bank*, Adv. Proc. No. 3:04–ap–00194–JAF (the "Adversary Proceeding") seeking, among other relief, a declaration that CNB was not entitled to enforce its rights under the pre-Petition loan documents. On April 28, 2004, CNB filed a motion to transfer venue of Debtor's Chapter 11 Case and the Adversary Proceeding from the Southern District of New York to the Middle District of Florida. On May 20, 2004, the Bankruptcy Court for the Southern District of New York entered an order granting that motion and transferring Debtor's Chapter 11 Case and the Adversary Proceeding to this Court. On September 30, 2004, CNB filed a secured proof of claim (Claim No. 84) against Debtor in the total amount of $6,111,822.44, the Bank Claim. (Debtor's Ex. 1; Silver's Ex. 4.) Debtor paid CNB $137,500 in satisfaction of its disputed claim for attorneys' fees under § 506(b). (Debtor's Ex. 9.) This matter was consensually resolved on December 19, 2005 between the parties before any proceeding was held before the Court.

On or about October 29, 2004, Silver acquired 96.02% of the Bank Claim by purchasing two of the four promissory notes (the "Silver Notes") pursuant to a Note Purchase Agreement and Loan Agreement (the "Note Purchase Agreement"). (Debtor's Ex. 10; Silver's Ex. 5.) Silver did not pay cash; rather, it financed its purchase of the Silver Notes with a $7,000,000 purchase-money loan from CNB, secured by the Silver Notes themselves. (Debtor's Ex. 10 and Silver's Ex. 5 at § A(1)(a).) The purchase price for the Silver Notes was 100% of their face value, plus all accrued interest due and was payable as of closing. (*Id.* at § A(1)(f).) The Note Purchase Agreement also provides for the reimbursement of Silver's fees and costs by CNB. (*Id.* at § A(7)(c).) The Note Purchase Agreement and Silver Notes are governed by Florida law. (*Id.* at § C(13); Debtor's Ex. 1, Attach. 1 at § 9.)

From the outset of the case, Debtor planned to sell the Property and use the proceeds to pay off its creditors. After intense marketing by Debtor's court-approved investment banker, General Capital Partners, Debtor entered into an Asset Purchase Agreement (the "Purchase Agreement") with Pine Properties and Development, Inc. ("Pine") whereby Pine agreed to purchase the Property for $8,700,000. The Purchase Agreement resulted from months of negotiations between Debtor and Pine. At the time the Purchase Agreement was executed, the purchase price exceeded the amount of the Bank Claim by approximately $2,000,000.

On January 7, 2005, Debtor filed its Plan of Reorganization of Debtor Lake Diamond Associates, LLC (the "Plan"), and on January 10, 2005, filed an accompanying disclosure statement (the "Disclosure Statement"). The Plan and Disclosure Statement detailed Debtor's intent to sell the Property to Pine, or to a bidder submitting a higher and better offer, and to use the proceeds to pay all allowed claims. The Plan and Disclosure Statement indicated that the sales price sought from Pine was sufficient to pay the Bank Claim in full, including interest; therefore, they listed the Bank Claim as unimpaired.

On January 19, 2005, Debtor filed a motion seeking, *inter alia,* the entry of an order (i) approving procedures whereby Debtor would solicit higher and better offers for the purchase of the Property and conduct an auction thereof (the "Bid Procedures") and (ii) authorizing Debtor to sell the Property to Pine or the prevailing bidder at the auction (the "Sale Motion"). A hearing to approve the Bid Procedures was scheduled for February 24, 2005 (the "Bid Procedures Hearing").

On February 14, 2005, Silver filed a Notice of Transfer of Claim Pursuant to Fed. Rule Bankr.Procedure 3001(e)(2) and Waiver of Opportunity to Object (the "Notice of Transfer").[1] (Debtor's Ex. 2; Silver's Ex. 6.) The Notice of Transfer stated that CNB transferred 96.02% of the principal amount of the Bank Claim to Silver. (*Id.* at p. 1.) CNB retained 3.98% of the principal amount of the Bank Claim. The effective date of the assignment documents was October 29, 2004.(*Id.*)

On the same day, without a contested matter being initiated under Federal Rule of Bankruptcy Procedure 9014, Silver took its first action in the Chapter 11 Case by serving discovery upon Debtor and Pine with respect to the proposed sale. Silver's counsel argued that discovery was neces-

---

1. Notwithstanding the Note Transfer, counsel for CNB continued to actively participate in this case by, among other things, attending each hearing, negotiating the terms of the Plan and Sale Motion, and attending the depositions taken with respect to the Sale Motion.

sary to ascertain the identity of Pine's principals and Pine's ability to close on the purchase, as well as other concerns. Counsel later averred that this information was necessary to protect Silver's interest in the Property.

On February 15, 2005, nine days prior to the Bid Procedures Hearing, Silver filed an objection to the proposed Bid Procedures. (Silver's Ex. 7.) On February 23, 2005, Silver filed a motion requesting a continuance of the Bid Procedures Hearing due to Pine's failure to submit itself to deposition. Silver's position, as argued by counsel at the February 24, 2005 Bid Procedures Hearing, was that the identity of Pine and its financial wherewithal to close the proposed transaction were not adequately disclosed and, therefore, the Bid Procedures Hearing should be continued until such time as discovery could proceed against Pine. (Debtor's Ex. 4 at p. 13, lines 10–17; Silver's Ex. 7.) The Court did not agree with Silver's position and denied Silver's motion for continuance. (Debtor's Ex. 4 at p. 41, lines 13–17.)

At the Bid Procedures Hearing, Silver then objected to the Bid Procedures by stating that the proposed break-up fee was excessive and should be reduced. (Debtor's Ex. 4 at p. 130, line 22 through p. 131, line 23.) Pine initially indicated that it was unwilling to reduce the break-up fee and suggested that if it were reduced, Pine would walk away from the contract. (Id. at p. 137, lines 2–7.) Silver then stated to the Court that if Pine was going to withdraw from the contract, then Silver would "offer a contract all cash, no financing contingency, no study period contingency, the usual title stuff, with no break-up fee, $8,850,000." (Id. at p. 137, lines 18–21.) This last minute offer was not accepted by Debtor. (See id. at p. 140, line 13 through p. 141, line 20.) Ultimately, Pine agreed to a voluntary reduction in the break-up fee. (Id. at p. 141, line 9–20.) Thereafter,

the Court approved the Bid Procedures. (Id. at p. 142, lines 12–16.)

On February 23, 2005, Debtor produced documents and submitted itself to deposition. Silver produced documents and offered Mr. Paul Elkin ("Mr. Elkin") as Silver's corporate designee pursuant to Federal Rule of Civil Procedure 30(b)(6). (Debtor's Ex. 8.) During his deposition, Mr. Elkin testified, inter alia, that the Silver companies (i) were in the business of land development and lending (Debtor's Ex. 8 at p. 9, lines 5–10); (ii) were made aware of the Property a year prior to its involvement in the Chapter 11 Case through a sales contact at Lowell Homes, another Florida land developer (Id. at p. 16, lines 4–8 and 14–23); (iii) created a special purpose entity specifically to acquire the Silver Notes (Id. at p. 9, lines 19–21); (iv) engaged in unsuccessful negotiations with Debtor's principal to buy the Property two months prior to appearing in the Chapter 11 Case (Id. at p. 19, line 25 through p. 20, line 16 and p. 27, lines 7–24); and (v) acquired the Silver Notes for the purpose of acquiring the Property (Id. at p. 33, line 23 through p. 34, line 2.) Further, with respect to repayment of the Silver Notes, Mr. Elkin testified during his deposition that: (i) Silver was not concerned with its ability to be paid in full (Id. at p. 14, lines 22–25; p. 38, lines 7–11; p. 41, lines 12–16; p. 56, lines 16–20; and p. 57, lines 1–4); (ii) he believed the Property was worth at least the secured debt or perhaps more (Id. at p. 19, lines 2–9); and (iii) Silver would not have purchased the Silver Notes if it did not believe the Property would yield as much as the secured debt (Id. at p. 25, lines 6–9).

After the Bid Procedures Hearing, the Court entered an order on March 9, 2005, authorizing Debtor to conduct the auction for the sale on April 21, 2005 (the "Auc-

tion"), and scheduling the hearing on the Sale Motion immediately following the conclusion of the Auction. On April 7, 2005, CNB filed its objection to the Sale Motion and on April 14, 2005, CNB filed its objection to the Disclosure Statement. On April 14, 2005, Silver also filed its objections to the Sale Motion and the Disclosure Statement.

On April 21, 2005, the Court conducted the Auction. (*See* Debtor's Ex. 13.) Several interested purchasers attended the Auction, including Silver. After robust bidding, the highest and best offer was ultimately submitted by Pine in the amount of $12,900,000 (the "Purchase Price"). (*Id.* at p. 26, line 24 through p. 27, line 4.) Silver submitted the second highest offer in the amount of $12,850,000 (*Id.* at p. 26, lines 17–23), which was accepted by Debtor as a back-up offer. (*Id.* at p. 28, lines 6–7.) The Purchase Price was nearly double the amount of the secured debt held by Silver and CNB.

At the conclusion of the Auction, the Court approved the sale of the Property to Pine. (*Id.* at p. 31, lines 6–8.) Silver was approved as the back-up purchaser in accordance with the terms of the Bid Procedures. (*Id.* at p. 31, lines 8–9.) On June 30, 2005, the sale of the Property for the Purchase Price closed. On July 6, 2005, Debtor wired $6,842,186.73 to CNB in satisfaction of the Bank Claim. After payment of CNB's attorneys' fees pursuant to the parties' stipulation, Debtor filed its Notice of Effective Date. (Debtor's Ex. 6.) Then, on March 23, 2006, Debtor filed the Final Decree Motion.[2]

On September 1, 2006, fifteen months after the closing of the sale, Silver filed the Fee Motion.[3] The Silver Notes state that the payee is entitled to "reasonable attorneys' fees ... incurred by Payee in collecting or enforcing payment thereof...." (Debtor's Ex. 1, Attach. 1 at § 6.a; Silver's Ex. 4, Attach. C at § 6.a.) The Mortgage provides that "Mortgagor shall pay all the costs, charges and expenses, including, without limitation, reasonable attorneys' fees ... incurred or paid at any time by Mortgagee due to the failure on the part of Mortgagor to promptly and fully perform, comply with and abide by each and every stipulation, agreement, condition and covenant of the Note, this Mortgage, and any other Loan Documents." (Debtor's Ex. 1, "Mortgage and Security Agreement" at § 6; Silver's Ex. 4, Attach. F at § 6.) Furthermore, the Mortgage goes on to define attorneys' fees as "any and all legal fees of whatever nature...." (Debtor's

---

**2.** Silver objected to the Final Decree Motion asserting that Debtor improperly paid equity prior to satisfying all outstanding claims. Debtor asserts that it does not believe Silver is entitled to fees and costs, to which the Court agrees as to the majority of the fees claimed; thus, the Bank Fee Claim was satisfied by the payment to CNB. In addition, as is evident from the Final Decree Motion, Debtor escrowed sufficient funds to satisfy the remaining *de minimis* claims. Moreover, at the time Debtor allegedly paid its equity holders, Silver had yet to file its Fee Motion and no requests for administrative claims were pending and the deadline for such had passed. Accordingly, the Court does not find Silver's argument on this issue persuasive.

**3.** The Court believes that Silver's Fee Motion is most likely moot for a variety of reasons. First, the Court has always endorsed the maxim that to sit on one's rights is to lose one's rights. Waiting fifteen months before leaping to action with respect to its fees, no matter the excuse Silver propounds to the Court, is inexcusable. In addition, the Fee Motion is likely moot as there is nothing left in Debtor's estate. Silver took no actions to actively seek its fees or protect its fees proximate with the distribution from the estate. To the Court, it appears as though the Fee Motion was an afterthought by Silver. Notwithstanding the mootness of the issue, the Court will still address in specific detail why Silver is not legally entitled to the fees it claims in its motion.

Ex. 1, "Mortgage and Security Agreement" at § 17; Silver's Ex. 4, Attach. F at § 17.) The Silver Notes, Note Purchase Agreement, Mortgage and related security documents (collectively, the "Loan Documents") govern attorneys' fees requested in the Fee Motion.

The Fee Motion seeks reimbursement of fees pursuant to 11 U.S.C. § 506(b) in the amount of $131,656.79, although as amended[4] the final fee request is for $146,617.75 in fees[5] and $4,484.31 in expenses. Silver filed a total of three substantive pleadings in this case: an objection to the Bid Procedures (Silver's Ex. 7) and two joinders to pleadings filed by CNB. (Silver's Exs. 12 and 13.) Silver's counsel appeared before the Court three times: (i) the Bid Procedures Hearing, (ii) the Auction, and (iii) the confirmation hearing, at which they did not participate.

At the November 9, 2006 hearing (the "November 9 Hearing"), the Court heard testimony from Bruce Henry, Esq., counsel for Silver ("Mr. Henry"), and Mr. Elkin, chief legal officer for Silver. Silver offered no evidence from any disinterested person or expert as to allowance or reasonableness of the fees and costs sought.

Mr. Henry testified that the actions taken by Silver were primarily driven by Silver's concern with a possible slow-down of the Florida real estate market. Silver, however, offered no independent or extrinsic evidence on this issue. On cross-examination, Mr. Henry testified that at the time of the Auction, the Florida real estate market was very strong.

Mr. Henry also testified that Silver took the actions it did because it was concerned that the Bank Claim was not being adequately protected because no adequate protection payments had been made. On cross examination, Mr. Henry testified that at the time Silver acquired the Silver Notes from CNB, the Bank Claim was subject to an equity cushion of approximately $2,000,000 and that, to his knowledge, CNB never requested any adequate protection payments.

Mr. Elkin testified that he was concerned with Pine's ability to close the sale of the Property and the effects this would have on the Property's value in light of a slow-down in the Florida real estate market. No independent or extrinsic evidence was offered regarding the real estate market or its effects, if any, on the value of the Property at the time. The Auction results, however, suggest the opposite: that the value of the Property was actually increasing. Moreover, the fact that CNB never sought adequate protection also suggests that the secured lender felt there was sufficient equity in the Property.

Both witnesses testified that Silver was concerned with Debtor's consistent delays in selling the property. Neither witness, however, cited to specific delays which gave rise to these concerns, nor could they demonstrate why such delays would imperil the payment of the Bank Claim. Mr. Henry and Mr. Elkin both testified that Silver was receiving $15,000 per month from the interest differential between the

---

4. The Fee Motion requests payment for attorneys' fees attributable to four different attorneys/firms; however, prior to the November 9, 2006 Hearing, Silver withdrew its request for $24,876.74 in attorneys' fees attributable to Paul Elkin. Accordingly, these Findings of Fact and Conclusions of Law will not discuss such fees. However, at the November 9, 2006 Hearing, Silver amended its request to include an additional $39,837.70 in fees and costs allegedly incurred litigating the Fee Motion.

5. Because the Court finds the vast majority of Silver's fees as disallowed, the Court also finds the fees requested by Silver in litigating the Fee Motion are unwarranted, and therefore are also disallowed.

Silver Notes and the promissory note issued to CNB to acquire the Silver Notes.

In opposition to the Fee Motion, Debtor asserted primarily two arguments: (i) that Silver was only interested in purchasing the Property, not in holding the debt and (ii) payment of the debt was never at risk. Debtor supported these arguments by, among other things, Mr. Elkin's deposition admissions, statements made by counsel at the Bid Procedures Hearing, Silver's active participation at the Auction, the unrefuted equity cushion enjoyed by Silver, the terms of the Note Purchase Agreement, the then-pending sale to Pine, and the terms of the Plan deeming the Bank Claim unimpaired. This evidence, Debtor argues, demonstrates that Silver is not entitled to fees and costs under section 506(b), as interpreted by the Court and others.

After a review of the evidence in the record and the testimony before the Court and for the reasons set forth herein, the Court finds the argument of Debtor to be persuasive and will deny the Fee Motion with a minor allowance of fees discussed below.

## CONCLUSIONS OF LAW

### I. ANALYSIS OF THE ALLOWABILITY OF ATTORNEYS' FEES UNDER 11 U.S.C. § 502(b)(1).

The prevailing analysis of a fee determination for an oversecured creditor in the Eleventh Circuit is represented in *Welzel v. Advocate Realty Invs., LLC (In re Welzel)*, 275 F.3d 1308 (11th Cir.2001). In *Welzel*, the Eleventh Circuit articulated a two-part approach that a court must take in order to assess a fee claim by an oversecured creditor. As a threshold matter, a court must determine whether the claim is allowed pursuant to 11 U.S.C. § 502 and, if so, a court must consider whether the fees claimed are reasonable, pursuant to the three-part test enunciated by 11 U.S.C. § 506(b). *Id.* at 1318. Only after the court has considered this two-part approach does an oversecured creditor's claim for attorney's fees become bifurcated according to reasonable fees (to be treated as an allowed secured claim) and unreasonable fees (to be treated as an allowed unsecured claim).[6] *Id.*

According to *Welzel*, § 506(b) of the Bankruptcy Code "applies a reasonableness standard across-the-board to all contractually set attorney's fees." *Id.* at 1315. In reading and interpreting the two statutes, the *Welzel* court found that " § 506 deals with whether a claim is secured or not, as opposed to the larger question of whether the claim is allowed or disallowed, as addressed by § 502." *Id.* at 1317. Because § 506(b) simply determines, by analyzing the reasonableness of the fees, whether the fees are secured or not, while § 502 deals with allowance, "[s]ection 506(b) should be read against the backdrop of general instructions enunciated in § 502." *Id.* As a result, " § 506(b) is meant not to displace the general instructions laid down in § 502, but to be read together with § 502 in a complementary manner." *Id.* "Language and structure thus demonstrate that §§ 502 and 506 should be read in tandem with one another, for they address complementary but different questions." *Id.*

The connection between §§ 502 and 506 actually is quite obvious, as § 506(b) requires "reasonable fees, costs, or charges *provided for under the agreement under which such claim arose.*" 11 U.S.C.

---

**6.** In fact, one 11th Circuit bankruptcy court has specifically found that "the reasonableness inquiry and bifurcation approach employed by the Welzel Court are only appropriate if the fees are otherwise allowed and enforceable." *In re Friedel*, 324 B.R. 138, 144 (Bankr.M.D.Ala.2004).

§ 506(b) (2004) (emphasis added). That is, a court must first determine the scope of the attorneys' fees as defined per the terms of the agreement and ensure that the creditor has a contractual right to those fees before a court can engage in a reasonableness analysis. The *Welzel* court therefore took this rational step of interpreting the terms of the contract under § 506(b) and found the applicable Code provision, § 502, to guide a bankruptcy court in disallowing fees which an oversecured creditor does not legitimately have a right to claim. In essence, § 502 is congruous with the second prong of a § 506(b) analysis: to wit, whether the agreement between the oversecured creditor and the debtor provides an allowed claim for attorneys' fees and costs.

This is a subtle, yet completely perspicuous, distinction from whether an otherwise valid contract provision should be deemed unenforceable by state law, which would void the provision in its entirety. *See, e.g., First W. Bank & Trust v. Drewes (In re Schriock Constr., Inc.)*, 104 F.3d 200, 202–03 (8th Cir.1997) (holding that a North Dakota state statute prohibiting contractual provisions dealing with the payment of attorneys' fees contained in a note or mortgage, etc., is inapplicable to § 506(b)); *In re 268, Ltd.*, 789 F.2d 674, 675–76 (9th Cir.1986) (rejecting argument that because a contract is enforceable according to state law, the attorneys' fees must be reasonable as well and holding that reasonableness under § 506(b) is to be determined by a federal standard); *Blackburn–Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.)*, 794 F.2d 1051, 1056–58 (5th Cir.1986) (reaching same conclusion as *268, Ltd.*, 789 F.2d at 675–76); *Unsecured Creditors' Comm. 82–00261C–11 a v. Walter E. Heller & Co. S.E., Inc. (In re K.E. Stephenson Supply Co.)*, 768 F.2d 580, 585 (4th Cir.1985) (holding, after extensively discussing the legislative history of § 506(b), that oversecured creditor

was entitled to its attorneys' fees despite its failure to comply with a North Carolina notice requirement); *In re Bristol*, 92 B.R. 276, 276–78 (Bankr.S.D.Ohio 1988) (holding that an Ohio law which does not enforce an assessment of creditor's attorneys' fees without a showing of bad faith is trumped by § 506(b)). This would result in disallowing an otherwise enforceable claim in its entirety in accordance with state law. In most instances, this would create an unjustified windfall on behalf of the debtor, as otherwise valid claims for attorneys' fees would be disallowed completely.

But that is not what is currently before the Court. Instead, the Court must took to the contract itself, and apply § 502 to determine what meaning the parties agreed to include in the context of "reasonable attorneys' fees". Such an analysis is necessary to discern to what extent Silver would have a legal claim for attorneys' fees in a nonbankruptcy field. With the typical application of the bifurcated approach mandated by *Welzel*, the reasonableness prong of § 506(b) acts as a sufficient safeguard against excessive and egregious claims, because most unsecured claims are not paid 100% in full, as is the case currently before the Court.

 It is important to note, however, that *Welzel* also stated in dicta that "[i]n interpreting a Bankruptcy Code section, [courts] turn to the natural meaning of the terms employed therein except in the rare circumstance where to do so would produce an absurd result." 275 F.3d at 1314 (citing *Yates Dev., Inc. v. Old Kings Interchange, Inc. (In re Yates Dev., Inc.)*, 256 F.3d 1285, 1288–89 (11th Cir.2001)). *See also Am. Gen. Fin., Inc. v. Paschen (In re Paschen)*, 296 F.3d 1203, 1207 (11th Cir. 2002) ("The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a 'statute will produce a result demonstrably

at odds with the intentions of its drafters.") (quoting *US v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)) (alteration in original). This is precisely the rare circumstance wherein the natural meaning of the terms of §§ 506 and 502 would produce such an injustice that it is completely disconsonant with the intent of Congress. Because Congress' intent of § 506(b) was to ensure that oversecured creditors do not lose their reasonable claims for attorneys' fees simply due to the fact that their collateral is worth more than the underlying claim— rather than as a blank check for oversecureds to accrue legal fees beyond the scope of protecting their interest—the Court must apply a logical interpretation of these Code sections to reach the proper result. Thus, the Court views §§ 502 and 506 in conjunction with each other to disallow those fees under § 502 which would not be allowed by a Florida state court applying nonbankruptcy law, and to allow the fees incurred by Silver in its sincere attempts at protecting its interest in the Property, which are within the scope of the Loan Documents.

Section 502 of the Bankruptcy Code permits all claims to be deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a) (2004). If a party in interest does object, a court may then determine the allowable amount of that claim, taking into account the exceptions delineated in § 502(b) precluding allowance. 11 U.S.C. § 502(b) (2004). The Court notes that § 502(b)(1) is the only relevant exception, which disallows claims which are "unenforceable against the debtor and property of the debtor, under ... applicable law...." 11 U.S.C. § 502(b)(1) (2004).

Florida law is expressly applicable under the Loan Documents. (*See* Debtor's Ex. 10 and Silver's Ex. 5 at § C(13); Debtor's Ex. 1, Attach. 1 at § 9.) While Florida courts have always interpreted attorneys'

fees provisions in contracts very narrowly, *see, e.g., In re Woodham,* 174 B.R. 346, 348 (Bankr.M.D.Fla.1994) (citing *Ohio Realty Inv. Corp. v. So. Bank of West Palm Beach,* 300 So.2d 679 (Fla.1974)), contract law requires that a court not attempt to interpret a clear and unambiguous term. The Mortgage defines attorneys' fees quite broadly, but the phrase is also qualified by the term "reasonable". In determining what "reasonable" encompasses under the Loan Documents, Florida law dictates that such fees are typically those incurred by a secured creditor in protecting its debt.

> In making a fee determination, the Court must consider not only the fee agreement but the overall fairness and reasonableness of the fee under all of the circumstances. Reasonable fees are those necessary to the collection and protection of a creditor's claim and include fees for those actions which a similarly situated creditor might have taken. The fees must be cost justified by the economics of the situation and necessary to preserve the creditor's interest in light of the legal issues involved. A secured creditor is not entitled to compensation for its attorneys fees for every action it takes by claiming that its rights have been effected.

*In re Digital Prods. Corp.,* 215 B.R. 478, 482 (Bankr.S.D.Fla.1997) (citation omitted). *See also In re NuMed Home Health Care, Inc.,* 310 B.R. 226, 235–36 (Bankr. M.D.Fla.2004) (quoting *Digital Prods.,* 215 B.R. at 482); *In re Jemps, Inc.,* 330 B.R. 258, 262 (Bankr.D.Wyo.2005) ("In a case where fees are sought as part of a secured claim under § 506(b), other factors are considered also. The fact that a creditor is oversecured inherently provides protection of the claim. Thus, the creditor is only entitled to include services reasonably required to protect its interest in the loan. Overzealousness will not be compensated, even if the creditor approves of such action

by its counsel.") (citations omitted); *Sense-nich v. Molleur (In re Chase)*, 336 B.R. 681, 685 (Bankr.D.Vt.2005) ("The debtor in a loan transaction expects, and is rightly asked, to pay the expenses its secured creditor incurs in trying to collect the debt the debtor owes."); *In re Valdez*, 324 B.R. 296, 300 (Bankr.S.D.Tex.2005) ("In considering whether fees are reasonable under § 506, the Court must independently determine whether the creditor'... took the kind of actions that similarly situated creditors might reasonably conclude should be taken ....") (quoting *In re Univ. Towers Owners' Corp.*, 278 B.R. 302, 305–06 (D.Conn.2002)) (additional citations omitted).

It is axiomatic that it is customary within the lending industry to contract for rights which protect the lender if the debt is at risk of repayment. Florida contract law, however, cannot support the assumption that a borrower would agree to permit the lender via contract to be reimbursed for legal efforts *ad infinitum* beyond mere collection efforts.[7] *See, e.g., In re Mills*, 77 B.R. 413, 419–20 (Bankr.S.D.N.Y.1987) ("Code Section 506(b) requires the court to look not only to the underlying contract as the initial focal point but to examine that contract within the contours or broader penumbra of bankruptcy law, because after bankruptcy contracts do not exist in a vacuum. As has been observed: 'In permitting recovery of expenses covered by contract, a rule of reason must be ob-

served in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors, who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement expenses.' ") (quoting *In re Salis-bury*, 58 B.R. 635, 640 (Bankr.D.Conn. 1985)) (additional internal quotations and citations omitted). Thus, if a Florida state court were to award attorneys' fees pursuant to the Loan Documents, considering that the documents use language customary within the lending industry, the totality of the circumstances of the case suggest that a Florida state court would disallow much of Silver's claimed fees pursuant to state law. As a result, the Court finds that it is not equitable for Silver's counsel to be rewarded for the actions they took with respect to the Chapter 11 Case. Given the legal issues involved, the fees incurred by Silver are not cost justified by the economics of the situation, and must be disallowed under § 502(b)(1).

■ First, the fees incurred by Silver in connection with acquiring the Silver Notes would be disallowed by a Florida state court. Notwithstanding the principal tenets of contract law, public policy alone dictates that allowing these fees would be patently unfair. A debtor's estate could be dwindled to nothing if a debtor was required to pay the attorneys' fees of purchaser after purchaser of a debt owed to an oversecured creditor. Moreover, the

---

7. It is important to note that *Welzel* dealt with the interpretation of a contractually set rate of 15% and its allowance under Georgia state law—specifically whether a 15% rate was enforceable under O.C.G.A. section 13–1–11 (1982). *Welzel*, 275 F.3d at 1311. This section of the Georgia statutes specifically allows for contracts to provide for attorneys' fees of up to 15%. *Id.* at 1313 n. 3. In addition, so long as the creditor provides ten days' notice, the full 15% is recoverable whether the fees are earned or not. *Id.* The parties in *Welzel* were well aware that the contract provision

was valid under Georgia law, as the parties did not dispute the validity of the fees pursuant to 11 U.S.C. § 502. *Id.* at 1316 n. 5. The Court is currently reviewing the validity of the Loan Documents precisely because Florida does not have a statute which directly speaks to the enforceability of such fees. Instead, Florida courts examine such provisions on a case-by-case basis, applying general contract law principles within the scope of bankruptcies: to wit, what would similarly situated creditors do in a typical § 506(b) situation.

fees were not incurred by a secured creditor in protecting its debt, are not cost justified, and are not those that a similarly situated creditor might have taken.

As a result, Haile, Shaw & Pfaffenberger, P.A.'s ("Haile Shaw") fees are disallowed in their entirety, as there is not a single entry within the time records which the Court can comfortably relate to the protection of a debt. The vast majority of the fees were incurred during Silver's acquisition of the Silver Notes. Furthermore, many of the time entries submitted by Haile Shaw are vague or not sufficiently descriptive so that the Court can make an educated decision as to what the fees actually encompass.[8] Silver also submitted evidence showing that Haile Shaw expended $147.25 in costs. These expenses include a survey copy of the Property, Federal Express, duplication charges, and a courier service. Because all of these costs were incurred in Silver's acquisition of the Silver Notes, these expenses are also disallowed in their entirety. Thus, Silver shall recover nothing for Haile Shaw's legal efforts, as these represent fees and expenses incurred in connection with the purchase of the Silver Notes.

■ The fees incurred by Silver in its attempt to purchase the Property are also disallowed. At the Bid Procedures Hearing, Silver offered—after Pine indicated it might breach the sale contract if the break-up fee was reduced—$8,850,000 for the Property. At the Auction, Silver submitted the second highest offer in the amount of $12,850,000, which offer was accepted by Debtor as a back-up offer. At the conclusion of the Auction, Silver was approved as the back-up purchaser in accordance with the terms of the Bid Procedures.

A Florida court deciding the issue would not possibly construe fees incurred by Silver in attempting to purchase the Property as within the context of the Loan Documents pursuant to Florida law. Notwithstanding the inability of the Court to interpret the contractual "reasonable attorneys' fees" as including Silver's attempts to acquire the Property, the fees were simply not collection costs, and they were not those which a similarly situated creditor might have taken. According to the time records submitted, Silver states that Henry, O'Donnell, Dahnke & Walther, P.C. ("Henry O'Donnell") spent 47.1 hours and Smith, Hulsey & Busey ("Smith Hulsey") spent 35.1 hours for asset disposition.[9] (Silver's Ex. 29, Attach. "Summary of Henry O'Donnell's Fees and Hours by Category".) The Court disallows these fees pursuant to § 502(b)(1), as these hours reflect time spent by Silver in attempting to acquire the Property.

8. For example, the Court notes entries described as "Outstanding issues" (Silver's Ex. 28, Invoice # 26321 at p. 1), "Meeting follow-up matters" (*Id.*), and "John Gregory" (Silver's Ex. 28, Invoice # 26644 at p. 1), which are so vague that the Court cannot ascertain for what the client was charged. Also, time entries identified as "Closing and Collection matters" (Silver's Ex. 28, Invoice # 26321 at p. 1) and "Conference with Dave Shaw and Terry Resk on potential lawsuit and background information" (Silver's Ex. 28, Invoice # 26644 at p. 1) are not sufficiently described so that the Court can attribute a specific amount of time solely to collection efforts

(and even more specifically, what those collection efforts included), or that the Court can determine what specifically the "potential lawsuit" is about. The Court would assume the lawsuit labels the legal actions Silver had to take with respect to its quest for fees, but it is not the place of the Court to make such assumptions. Silver bore the burden of proving its entitlement to fees, and with respect to the fees incurred at Haile Shaw, Silver failed in carrying that burden.

9. Defined by Silver as "Sales, leases (§ 365 matters), abandonment and related transaction work." (Silver's Ex. 29, Ex. B.)

As to the remainder of Silver's fees, the Court finds that Silver acted overzealously and failed to exercise proper restraint in procuring its fees. As stated by *Digital Prods.* and echoed by the Middle District in *NuMed,* a court must consider the overall equity and reasonableness of the circumstances. *Digital Prods.,* 215 B.R. at 482; *NuMed,* 310 B.R. at 235 (quoting *Digital Prods.,* 215 B.R. at 482). With respect to reviewing contracts for allowance of fees in a § 506(b) situation, one court has suggested that "the touchstone of [a § 506(b) ] analysis is a determination of what a creditor would spend if the creditor was paying the attorney's fees and costs rather than having the ability to pass those fees and costs on to the debtor." *In re Smoots,* 230 B.R. 140, 144 (Bankr. D.Minn.1996). This is because "[a] secured creditor is not entitled to compensation for its attorneys fees for every action it takes by claiming that its rights have been effected." *Digital Prods.,* 215 B.R. at 482. *See also In re Kroh Bros. Dev. Co.,* 105 B.R. 515, 521 (Bankr.W.D.Mo.1989) ("[A]n oversecured creditor is not entitled to compensation for its attorneys' fees for *every* action it takes by claiming that its rights have been affected: 'It is clear that creditors are entitled to engage counsel and pay for constant, comprehensive, and aggressive representation, .... [but] where services are not reasonably necessary or where action is taken because of an attorney's excessive caution or over-zealous advocacy, courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs under § 506(b).' ") (quoting *In re Wonder Corp. of America,* 72 B.R. 580, 591 (Bankr. D.Conn.1987) aff'd, 82 B.R. 186 (D.Conn. 1988)) (emphasis in original); *In re Good,* 207 B.R. 686, 689 (Bankr.D.Idaho 1997) ("[A] Court must view a creditor's decisions objectively to see that an oversecured creditor is not given a blank check to incur fees and costs which will automatically be reimbursed out of its collateral.") (internal quotations and citation omitted); *In re Davidson Metals, Inc.,* 152 B.R. 917, 921 (Bankr.N.D.Ohio 1993) ("While [the creditor] is free to utilize whatever size cadre of lawyers it prefers, the costs attributable to 'overlawyering' should be borne by the creditor rather than by [the debtor].") (citations omitted); *In re Ward,* 190 B.R. 242, 250 (Bankr.D.Md.1995) ("Courts interpreting this section have made clear that § 506(b) does not provide an uninhibited mechanism for an oversecured creditor to obtain fees and expenses for its counsel to make up for unrelated, uncompensated or undercompensated work.") (citing *Kroh Bros.,* 105 B.R. at 520 and *Davidson Metals,* 152 B.R. at 921).

Courts have recognized that fees such as those defined in the Loan Documents typically are those accrued while a creditor seeks adequate protection or when a creditor actively participates in the bankruptcy proceeding until the plan is confirmed, the collateral is sold, or the case is converted or dismissed. *See Kroh Bros.,* 105 B.R. at 521 (citation omitted). In addition, an oversecured creditor may have the need to protect its lien if there is a risk of nonpayment. The court in *In re Schriock Constr., Inc.,* 210 B.R. 348, 351 (Bankr. D.N.D.1997), listed various risk factors attendant with justifiably causing an oversecured creditor to obtain counsel and pursue vigorous legal actions. Such factors include the type of property at issue—the *Schriock* court noted that real property is far more stable than a quickly depreciating asset such as construction machinery—or the quality of the debtor-in-possession's management skills and the prospects for an effective reorganization. Moreover, "[t]he need for aggressive and/or massive legal representation to protect a security interest escalates dramatically where the asset is wasting or remains in possession of a debtor lacking the skills or finances to

care for and preserve it." *Id.* None of those factors were present with respect to Debtor or its Chapter 11 Case.

■ In fact, Silver was admittedly well oversecured and enjoyed a substantial equity cushion, so much so that Silver itself was willing to bid $12,850,000—more than twice the amount of Silver's claim—as a back-up offer to purchase the Property. Mr. Elkin testified during his deposition no less than five times that he knew that Silver, as a secured creditor, would be paid in full. (*See* Debtor's Ex. 8 at p. 14, lines 22–25; p. 38, lines 7–11; p. 41, lines 12–14; p. 56, lines 16–20; p. 57, lines 1–4.) In such situations, where the creditor is assured of recovering its investment, there is an even greater tendency of the creditor to aggressively litigate and incur additional costs. *See In re Lederman Enters., Inc.,* 106 B.R. 674, 679 (Bankr.D.Colo.1989) ("[W]here a lender is assured of being repaid not only principal and interest but also all costs of collection which it might incur in chasing the debtor, there is a risk that the lender will permit or encourage its counsel to proceed with collection efforts with unbridled zeal.") (citation omitted).

Furthermore, CNB never sought adequate protection, and Silver never found it necessary to seek adequate protection, either. Silver was far from actively participating in the Chapter 11 Case: it appeared before the Court three times since it first entered the case—and at one of those appearances Silver's counsel did not even participate—and it filed three substantive pleadings in a case which had 320 docket entries up to the point of confirma-

tion. Moreover, the Court recognizes that Silver only appeared in the case after Debtor had requested authority to sell the Property at auction for an initial stalking-horse price that far exceeded the Bank Claim, then Silver proceeded to take actions of a potential purchaser rather than a fully secured lender. In addition, the amount of Silver's fees was partly due to litigation services that Silver's attorneys brought upon themselves and which were antagonistic to the best interests of the bankruptcy estate. For example, Silver took discovery in an attempt to identify the prospective purchaser of the Property due to claimed concerns of Pine's ability to close on the sale, even though Silver admitted it was interested in acquiring the Property itself.[10]

Silver's participation in the case more effectively stonewalled Debtor's licit efforts at reorganization than facilitated it.[11] The majority of Silver's fees were incurred in conjunction with its opposition to the approval of the Bid Procedures. These actions are not indicative of a creditor protecting its debt and securing repayment thereof. For instance, Silver's opposition to the break-up fee, which it claimed was the main issue at the Bid Procedures Hearing, is not something a typical first-position, admittedly oversecured creditor would undertake. Rather, it is more in line with that of a competing purchaser or an unsecured creditor.

The Court finds that Silver acquired the secured debt to best position itself to purchase the Property and it did so with no downside. Indeed, it could pursue the

---

**10.** Without a contested matter under way, Silver served discovery upon Debtor and Pine with respect to the proposed sale, for the contended purpose of ascertaining the identity of Pine's principals and Pine's ability to close on the purchase, as well as other concerns. Silver's counsel later averred that this information was necessary to protect Silver's interest in the Property. This was Silver's

first legal action in the Chapter 11 Case, aside from the transactional work concomitant with the acquisition of the Bank Claim.

**11.** In fact, not only were Silver's actions disruptive, but their involvement actually increased the cost of the Chapter 11 Case because Debtor had to respond to all of the unnecessary litigation foisted upon it.

purchase of the Property by credit bidding and, if it were unsuccessful, have its claim satisfied from the proceeds of the Debtor's previously requested sale. Further, pursuant to the Note Purchase Agreement, if Silver incurred any risk with respect to its claim or collateral, it could get out of the deal by forcing CNB to repurchase the Silver Notes. (*See* Debtor's Ex. 10 and Silver's Ex. 5 at § A.8.) If Silver exercised this option, the amount payable by CNB would include all of Silver's out of pocket expenses from the transaction, including attorneys' fees, thereby returning Silver to its original position. *Id.*

Lastly, the Court notes that at the time Silver incurred these fees, CNB also continued to actively represent its secured position. For instance, CNB attended each and every hearing and negotiated the terms of the Plan and the order for the sale of the Property with Debtor's counsel. The Court finds that there was clearly duplication of effort between CNB and Silver with respect to representation of the secured claim in this case; CNB has already received $137,500 from Debtor for its representation. The Court further recognizes that there was not only substantial duplication of effort between CNB and Silver but also among counsel for Silver. The Court finds such duplicative services to be disallowed pursuant to § 502(b)(1).

Accordingly, the actions required by Silver to maintain and secure its position in this case do not justify the Debtor absorbing approximately $150,000 in attorneys'

fees and costs. As already found once by the Court in *In re Pak,* 252 B.R. 215, 220 (Bankr.M.D.Fla.2000), only those fees that are "truly necessary to protect [a creditor's] interest" are allowable. The bulk of the fees incurred by Silver were not collection costs, and they were not those which a similarly situated creditor might have taken. In considering all of the circumstances of the case, it would be patently unfair and a disservice to Debtor to reward Silver for its actions.

As an initial statement, the Court would like to note that while Silver attempted to clarify the nebulous and bewildering records by attaching a chart categorizing the fees, the Court is still confounded as the categories are given perfunctory explanations which are of little assistance to the Court. Given this problem, the Court attempts as best it can to assign each category its most comprehensive understanding.

Silver states that the Henry O'Donnell counsel spent 5.7 hours for fee employment/objections [12], 2.05 hours at relief from stay proceedings [13], 2.45 hours for claims administration and objections [14], 96.35 hours for litigation [15], and 31 hours for reviewing and participating in the plan and disclosure statement.[16] (Silver's Ex. 29, Attach. "Summary of Henry O'Donnell's Fees and Hours by Category".) The bulk of these fees were accrued due to a failure of Silver to exercise proper restraint in protecting its interest. It would be inequitable for Debtor to absorb the Silver's

12. Defined as "Review of and objections to the employment and fee applications of others." (*Id.*)

13. Defined as "Matters relating to termination or continuation of the automatic stay under § 362." (*Id.*)

14. Defined as "Specific claim inquiries; bar date motions; analyses, objections and allowance of claims." (*Id.*)

15. Defined as "Court appearances on contested matters and adversary proceedings and work related thereto." (*Id.*)

16. Defined as "Formulation, presentation and confirmation; compliance with plan confirmation order, related orders and rules; disbursement and case closing activities except those related to the allowance and objections to allowance of claims." (*Id.*)

attempt at using § 506(b) as a blank check to run up excessive litigation efforts which were antagonistic to Debtor's legitimate reorganization endeavor.

For the fees related to fee employment/objections, the time Silver spent reviewing the applications of others was solely for the self-interest of Silver in its attempt to recover fees. These fees have nothing to do with the collection of a debt and are disallowed completely. With regard to the fees for the relief from stay proceedings, a thorough review of the time records and an independent review of the docket show that Silver took no actions with respect to terminating or continuing the automatic stay in the Chapter 11 Case. While such actions typically are consonant with those that a similarly situated creditor would take, because Silver never filed a single document relating to the termination or continuation of the automatic stay (as there was no need since the collateral was heavily oversecured), these fees also should not be borne by Debtor pursuant to § 502(b)(1).

Silver states that the Henry O'Donnell counsel spent 2.45 hours spent for claims administration and objections. As best as the Court can construe from the records, these hours reflect time spent in conjunction with the substantive pleadings Silver filed in objection to the Bid Procedures, its joinder with CNB's objection to the Auction, and its objection to the Disclosure Statement. The Court disallows the fees connected to Silver's objection to the Bid Procedures, as these actions were antagonistic to the legitimate efforts of Debtor to reorganize, and are more in-sync with actions taken by a potential purchaser rather than a secured lender. The Court allots two hours of work to Silver's objection to the Bid Procedures, which amount is disallowed.

For litigation efforts, Silver claims Henry O'Donnell spent 96.35 hours in attendance at hearings and contested matters. The Court assumes this large number stems from Silver seeking reimbursement of its legal fees, as Silver's counsel was only in attendance at three hearings, which at one counsel did not even participate. The vast majority of these fees are disallowed. The Auction and Disclosure Statement hearings did not last longer than 1.5 hours, and given the length of the Bid Procedures Hearing, only one hour represents counsel's efforts which were not related to Silver's attempt to purchase the Property or frustrate Debtor's legitimate efforts. The Court will disallow 93.85 hours as excessive litigation.

Lastly, Silver claims that Henry O'Donnell spent 31 hours reviewing and participating in the Plan and Disclosure Statement. While customarily such fees represent appropriate efforts undertaken by an oversecured creditor in protecting its debt, it is improbable that Silver's counsel actually spent that much time with respect to the Plan and Disclosure Statement for justifiable reasons. The Court finds it unfathomable that an oversecured creditor could possibly spend 31 hours reviewing documents in connection with a single-asset case. Silver's counsel did not even participate at the hearing on the Disclosure Statement. Thus, the Court disallows 16 hours as duplicative between CNB (which extensively participated in the Plan and Disclosure Statement), between additional counsel for Silver, and as beyond protecting Silver's interest.

Smith Hulsey's time records indicate that counsel spent 5.9 hours for financing[17], 15.2 hours for claims administration

---

**17.** Silver defines financing as "Matters under §§ 361, 363 and 364 including cash collateral and secured claims; loan document analysis." (*Id.*)

and objections, 188.8 hours for litigation, and 1.1 hours reviewing and participating in the plan and disclosure statement. (Silver's Ex. 30, Tab A "Summary of Smith Hulsey & Busey's Fees and Hours by Category".) For the claimed 15.2 hours spent by Smith Hulsey for claims administration and objections, the Court disallows the fees connected to Silver's objection to the Bid Procedures, as it did with Henry O'Donnell's fees. The Court deems eight hours as allotted to the Bid Procedures objection and are disallowed.

Silver claims that Smith Hulsey spent 5.9 hours for financing efforts. Silver never sought adequate protection payments and Debtor never sought credit. The Court will assume that this category includes efforts with respect to the Auction and loan document analysis. The Court finds that Silver's efforts with respect to the Auction were antagonistic toward Debtor's best efforts at reorganization. For that, such fees are disallowed, which the Court finds to be half of the claimed fees for financing efforts.

Silver next claims that Smith Hulsey spent 188.8 hours for litigation. As already stated, Silver's counsel was only in attendance at three hearings, which at one counsel did not even participate. Thus, the vast majority of these fees are disallowed. Therefore, the Court will disallow 186.3 hours as excessive litigation.

Silver claimed a total of 506.65 hours expended by the three law firms it retained. The Court has disallowed Haile Shaw's fees in their entirety (75.9 hours). Of Henry O'Donnell's claimed 184.65 hours of legal work, the Court has disallowed 166.7 hours, leaving 17.95 hours to be as-

sessed for reasonableness. And for Smith's Hulsey's claimed 246.1 hours, the Court has disallowed 232.35 hours, leaving 13.75 hours to be evaluated for reasonableness. In total, the Court will only allow 31.7 hours, which the Court will determine if those are reasonable according to § 506(b).[18]

## II. REASONABLENESS OF ATTORNEYS' FEES UNDER 11 U.S.C. § 506(b).

Section 506(b) grants secured lenders the right to seek reimbursement of "reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b) (2004). The Court has held that a party seeking relief under this section must demonstrate: (1) that its claim is oversecured in excess of the fees and costs requested; (2) that the agreement between the secured party and the debtor provides a claim for attorneys' fees and costs; and (3) that the fees and costs sought are reasonable. *Pak*, 252 B.R. at 219 (citing *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). *See also Welzel*, 275 F.3d at 1311 ("[T]he Bankruptcy Code, 11 U.S.C. § 506(b), provides that an oversecured creditor is entitled to *reasonable* attorney's fees as part of its allowed secured claim if the underlying loan contract provides for such fees.") (emphasis in original).

### A. *The Claim held by Silver and CNB is oversecured.*

The parties do not dispute that the Bank Claim ($6,111,822.44), the settlement Debtor paid to CNB in satisfaction of its disput-

---

18. As an aside, the Court feels it is important to note that this opinion in no way criticizes Silver's attorneys for the actions taken. Silver's counsel was hired to do a job, which was to acquire the Property, and the Court does not take any issue with Silver's counsel

zealously advocating the best interests of their client. Instead, this caveat is not directed to the attorneys of the case, but to Silver, and in that respect, to Silver's ability to get reimbursed from the proceeds of Debtor's estate.

ed claim for attorneys' fees ($137,500), and the current disputed amount Silver claims for attorneys' fees and costs ($146,617.75 plus expenses) enjoyed a substantial equity cushion during the entirety of this case. The record before the Court, including the order approving the sale of the Property and results of the Auction, support this finding. Accordingly, the first requirement of § 506(b) is satisfied.

## B. *The Loan Documents only provide for payment of certain fees in bankruptcy.*

The Loan Documents dictate whether Silver is entitled to attorneys' fees. As found above, the Loan Documents only provide for those actions which a similarly situated creditor would take. The Court disallowed those fees which were not supported by the Loan Documents. Silver is, however, legally entitled to those fees incurred with respect to protecting its interest in the Property which are reasonable. As a result, the second requirement of § 506(b) is also satisfied.

## C. *Of Silver's attorneys' fees that are allowed under 11 U.S.C. § 502(b)(1), all are reasonable and therefore need not be reduced.*

■ The federal lodestar approach is utilized in determining reasonable attorneys' fees. *Pak,* 252 B.R. at 219 (citation omitted). Under the lodestar approach, courts consider the number of hours of service reasonably devoted to the case multiplied by the attorneys' reasonable rates, and reduced or enhanced according to the twelve-factor test enumerated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). *Pak,* 252 B.R. at 220 (citing *Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874, 877 (11th Cir.1990)).[19] Therefore, a court must "1) determine the nature and extent of the services rendered; 2) determine the value of those services; and 3) consider the factors laid out in [*Johnson* ] and explain how they affect the award." *Grant,* 908 F.2d at 877–78 (citation and footnotes omitted); *see also Pak,* 252 B.R. at 219 (citing *Grant,* 908 F.2d at 877). In considering the *Johnson* factors, however, "[e]ach ... factor ... must be considered in light of the other factors, and 'a genuine balance must be struck by the bankruptcy judge.' " *Grant,* 908 F.2d at 879 (quoting *In re U.S. Golf Corp.,* 639 F.2d 1197, 1205 (5th Cir.1981)).

The Court finds that of the allowed fees claimed by Silver, all of the allowed fees are reasonable and will not be reduced. While all of the *Johnson* factors are considered by the Court, the factors particularly relevant are as follows.

*Time and Labor Expended.* Silver submitted time records indicating an aggregate of 506.65 hours incurred. This was the result of three different law firms spending on average approximately 169 hours each. Given the specific circumstances of the case, as the Court found above, much of the services were rendered solely to improve Silver's position as a

---

**19.** Applying the *Johnson* factors, courts consider the following in evaluating a professional's compensation request: (i) time and labor expended; (ii) novelty and difficulty of the questions raised; (iii) skill required to properly perform the legal services rendered; (iv) attorney's opportunity cost in pursuing the matter; (v) customary fee for like work; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or cir-

cumstances; (viii) amount in controversy and the results obtained; (ix) experience, reputation, and ability of the attorney; (x) undesirability of the case within the legal community in which the case arose; (xi) nature and length of the professional relationship between attorney and client; and (xii) attorney's fee awards in similar cases. *Johnson,* 488 F.2d at 717–19.

potential buyer of the Property. The Court is only allowing 31.7 hours pursuant to § 502(b)(1), which reflect a reasonable amount of time an oversecured creditor would expend in protecting its interest in the collateral of the estate.

*Novelty and Difficulty of Questions Raised.* Silver claims the fees and expenses incurred by its counsel were necessary to legitimately protect Silver's interest in the sale of the Property and in the Amended Plan, which paid 100% distribution to all creditors and a substantial distribution to equity. If this were an accurate portrayal of what Silver utilized in legal services, then the case involves a relatively simple proceeding to protect an oversecured creditor's interest in a commercial venture in residential property and the ancillary distribution from a bankruptcy plan. This hardly creates a novel legal situation. Instead, that would be the type of legal situation providing for very minimal legal interaction *vis-à-vis* what actually transpired in the case.

*The Skill Required to Properly Perform the Legal Services Rendered.* The case involved relatively simple and commonplace legal issues. Such circumstances would not require much skill by sophisticated attorneys, such as Silver's counsel. Instead, an oversecured creditor, which would stand to receive its full investment from a debtor, would typically only need counsel's skills if its interest were somehow at stake.

*Customary Fee for Like Work.* Smith Hulsey claims a blended rate of $258.26 and Henry O'Donnell claims a blended rate of $344.45. Primary counsel to Debtor, Arent Fox, and the Creditors' Committee, Duane Morris, LLP, had blended rates of approximately $314 and $357, respectively. The Court recently approved the fee applications, and therefore the rates, of primary counsel to Debtor and the Creditors' Committee. The Court finds that these rates are reasonable as they are within the boundaries of the customary rates of similar firms.

*Fee Awards in Similar Cases.* Without having to look much further than the case currently before the Court, it is readily apparent that Silver's initial request for fees would have been unreasonable when compared to fee awards in similar cases. Debtor agreed to award CNB $137,500 for its attorney's fees accrued from the Petition Date (February 24, 2004) until it filed its motion for attorney's fees on October 5, 2005. It is beyond the Court's comprehension why Silver would be entitled to the same amount of fees as the original oversecured lender, CNB, for work performed on an expedited basis.

### D. *Final award of fees and costs to Silver.*

As stated in *Welzel,* of the fees that are allowed, those that are deemed reasonable by the Court are an allowed secured claim by Silver. Silver will be entitled to reasonable attorneys' fees and costs based on the actions it took to protect its interest. The hours submitted by counsel are reasonable as explained below.

According to the time records submitted, Silver states that Henry O'Donnell spent 2.45 hours for claims administration and objections. The Court will award fees in connection with the objection to the Disclosure Statement and joinder to CNB's objection to the Auction. The Court disallowed two hours as beyond protecting Silver's interest in the Property, and therefore deems 0.45 hours as allowed and reasonable. Silver is entitled to $155.00 for the work performed by Henry O'Donnell for Silver's objection to the Disclosure Statement and its joinder to the objection the Auction.

For litigation efforts, Silver claims Henry O'Donnell spent 96.35 hours in attend-

ance at hearings and contested matters. The Court disallowed 93.85 hours as excessive litigation. Therefore, the Court will award Silver for the full amount of time Henry O'Donnell spent at the Disclosure Statement and the Auction, and for a small portion of the time spent at the Bid Procedures Hearing. The Court deems 2.5 hours as allowed and reasonable. For these 2.5 hours, Silver is awarded $861.13 for Henry O'Donnell's litigation efforts.

Lastly, Silver claims that Henry O'Donnell spent 31 hours reviewing and participating in the Plan and Disclosure Statement. The Court disallowed 16 hours as duplicative and excessive. Thus, Silver is entitled to $5,166.75 in reasonable fees for 15 hours Henry O'Donnell's counsel spent in relation to the Plan and Disclosure Statement.

As to costs, Silver claims that Henry O'Donnell expended $115.95. These expenses were for mailing charges, duplication fees, and for Federal Express. The Court finds that these costs were incurred while Silver attempted to protect its interests in the Property, and represent actions that a similarly situated creditor would take. In addition, the expenses encompass reasonable charges and reflect reasonable rates. Thus, the Court will allow Henry O'Donnell's expenses in their entirety.

With respect to Silver's claim for work performed by Smith Hulsey, for the claimed 15.2 hours spent for claims administration and objections, the Court disallowed 8 hours for fees connected to Silver's objection to the Bid Procedures. As a result, the Court deems 7.2 hours as allowed and reasonable. Therefore, Silver is entitled to $1,859.47 for the work associated with Silver's objection to the Disclosure Statement and at the Auction performed by Smith Hulsey.

For Smith Hulsey's 5.9 hours for financing efforts, the Court disallowed half under § 502(b)(1). The Court therefore awards

Silver fees for Smith Hulsey's efforts with respect to reviewing the Loan Documents. For such efforts, the Court deems 2.95 hours as allowable and reasonable, so Silver will recover $761.87 for Smith Hulsey's work reviewing the Loan Documents.

Silver next claims that Smith Hulsey spent 188.8 hours for litigation. The vast majority of these fees were disallowed. Therefore, the Court will award Silver for the full amount of time Smith Hulsey spent at the Disclosure Statement and the Auction, and for a small portion of the time spent at the Bid Procedures Hearing. The Court deems 2.5 hours as allowed and reasonable for the reasons stated above. Silver is awarded $645.65 for Smith Hulsey's litigation efforts.

Lastly, Silver claims Smith Hulsey spent 1.1 hours reviewing and participating in the Plan and Disclosure Statement. The Court finds these efforts allowed and reasonable; therefore, they are allowed in their entirety. Silver will recover $284.09 for Smith Hulsey's efforts in reviewing and participating in the Plan and Disclosure Statement.

As to costs, Silver claims that Smith Hulsey expended $4,221.11. These expenses were for telephone calls (including long-distance), in-house and outside document duplication, postage, Westlaw fees, fax transmissions, service of process, deposition transcript charges, and express mail. The Court disallows the fees for Westlaw, as these costs were incurred during Silver's attempt to acquire the Property, were beyond Silver's attempt to protect its interest in the Property, or were incurred during Silver's litigation of the Fee Motion. Therefore, $400.35 of Smith Hulsey's expenses is disallowed. As to the expenses for telephone calls, document duplication, postage, fax transmission and express mail, the Court also finds that the vast majority of these costs are not attrib-

utable to Silver's attempts to protect its interest, or stemmed from its attempts to acquire the Property or litigation of the Fee Motion. Of those expenses, $2,756.26 is disallowed. The Court deems the remainder, $1,064.50, to be reasonable costs that Silver can recover from Debtor.

For these tasks, the Court awards Silver attorneys' fees and costs in the amount of $10,914.41 (the "Allowed Fees").[20] These reflect fees for Henry O'Donnell's legal work in the amount of $6,182.88 and costs of $115.95, and fees for Smith Hulsey's legal work in the amount of $3,551.08 and costs of $1,064.50. The Allowed Fees are deemed reasonable and are recoverable as a secured claim by Silver.

## II. ENTRY OF THE FINAL DECREE IS APPROPRIATE.

In addition to the matters discussed above, Debtor also moved for the entry of a final decree closing the Chapter 11 Case. Silver objected on the grounds that entry of a final decree was premature given that its claim for attorneys' fees and costs had yet to be resolved. Federal Rule of Bankruptcy Procedure 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case." Fed. R. Bankr.P. 3022 (2004). Local Rule 3022–1 requires the filing of a final report and certificate of substantial consummation. Given that the Fee Motion has been resolved and Debtor has complied with the requirements of Local Rule 3022–1, the Court will grant the Final Decree Motion and enter an Order closing the Chapter 11 Case. Orders in accordance with these findings of fact and conclusions of law will be separately entered.

---

**20.** Anything more than this amount is duplicative of the work performed by CNB's counsel. If Silver feels entitled to more fees, it should seek reimbursement from CNB.